UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DARRELL L. WALDON,

Plaintiff,

-vs-                                Case No.  6:04-cv-628-Orl-28JGG

JO ANNE B. BARNHART,
Commissioner of Social Security,

Defendant.

_____

### REPORT AND RECOMMENDATION

Plaintiff Darrell L. Waldon ["Waldon"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying his application for a period of disability and disability insurance benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision should be **AFFIRMED**.

I.    **PROCEDURAL HISTORY**

On October 9, 2001, Waldon filed claims for disability insurance benefits, claiming disability as of May 1, 2001.[1]  R. 51-53.  On October 15, 2003, the Honorable Chester G. Senf, Administrative Law Judge ["ALJ"], held a hearing on Waldon's claim in Orlando, Florida. Waldon testified, and his attorney, Maria Santana, appeared with him at the hearing.  R. 301-20.

_____

[1]At the administrative hearing, however, Waldon amended his onset date to December 1, 2001.  R. 319.

On November 25, 2003, the ALJ ruled that Waldon was not entitled to benefits.  R. 17-27.

Following a review of the medical and other record evidence, the ALJ found that although Waldon

had severe impairments, he did not have an impairment or combination of impairments that met or

equaled a listed impairment.  R. 26, Findings 3-4.  The ALJ also found that Waldon's allegations

regarding his limitations were not fully credible.  R. 26, Finding 5.  Further, the ALJ determined

that Waldon could not perform his past relevant work, but retained the Residual Functional

Capacity ["RFC"] to perform a full range of sedentary work.[2]  R. 26, Findings 8, 12.  Accordingly,

the ALJ applied Medical-Vocational Guidelines ["Grids"] Rule 201.24, which directed a finding

of not disabled.  R. 26, Finding 13.

Waldon timely appealed the ALJ's decision to the Appeals Council.  R. 9.  Finding no

error or abuse of discretion, the Appeals Council denied review on February 27, 2004.  R. 6-8.  On

April 30, 2004, Waldon timely appealed the Appeals Council's decision to the United States

District Court for the Middle District of Florida.  Docket No. 1.  On April 18, 2004, Waldon filed

a memorandum of law in support of his appeal of the denial of review.  Docket No. 17.  On April

29, 2005, the Commissioner filed a memorandum in support of her decision that Waldon was not

disabled.  Docket No. 18.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Waldon assigns three errors to the Commissioner: 1.) erroneously relying on a mechanical

application of the Grids and failing to utilize the testimony of a vocational expert; 2.) improperly

---

[2] "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  20 C.F.R. § 416.967(a).

evaluating Waldon's pain; and 3.) improperly discrediting Waldon's testimony.  Pl.'s Brief at 2-3.

The Commissioner responds that her decision was supported by substantial evidence and was

decided by proper legal standards.  The Commissioner asserts that: 1.) exclusive reliance on the

Grids was proper because Waldon could perform a full range of sedentary work and did not have a

non-exertional impairment that limited his basic work skills; 2.) the ALJ properly evaluated and

discredited Waldon's allegations of pain.   Def.'s Brief at 6-9.

III.   **THE STANDARD OF REVIEW**

    A.   **Affirmance**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.

42 U.S.C. § 405 (g).  Substantial evidence is more than a scintilla — i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v.

Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th

Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937

F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court

will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if

the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards

v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th

Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence

favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v.*

*Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine

reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also

must consider evidence detracting from evidence on which Commissioner relied).

### B.   Reversal and Remand

Congress has empowered the district court to reverse the decision of the Commissioner

without remanding the cause.  42 U.S.C. § 405 (g)(Sentence Four).  The district court will reverse a

Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision

fails to provide the district court with sufficient reasoning to determine that the Commissioner

properly applied the law.  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064,

1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin*

*v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  This Court may reverse the decision of the

Commissioner, and order an award of disability benefits, where the Commissioner has already

considered the essential evidence and it is clear that the cumulative effect of the evidence

establishes disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993);

*accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).

The district court may remand a case to the Commissioner for a rehearing under sentence

four of  42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences.

*Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under

sentence four, the district court must either find that the Commissioner's decision is not supported

by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the

disability claim.  *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a

full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good

cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to filemodified findings of fact. *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. *Id*.

## IV.   **THE LAW**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416 (i), 423 (d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423 (d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.   **Treating Physicians**

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v.* Callahan, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);

*Sabo v. Commissioner of Social Security*,  955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. §

404.1527 (d).  If a treating physician's opinion on the nature and severity of a claimant's

impairments is well-supported by medically acceptable clinical and laboratory diagnostic

techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must

give it controlling weight.  20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating

physician's opinion or report regarding an inability to work if it is unsupported by objective

medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted

treating physician's report where the physician was unsure of the accuracy of his findings and

statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford

them such weight as is supported by clinical or laboratory findings and other consistent evidence of

a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also*

*Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does

not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the

1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent

of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with

the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to

support or contradict the opinion.  20 C.F.R. § 404.1527 (d).  However, a treating physician's

opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v.*

*Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527 (e).   The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner.  20 C.F.R. § 404.1527 (e).

### B.      Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.  However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Waldon v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and

to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

### C.     Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### D.     The Five Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520,  416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520 (b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520 (c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520 (d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20

C.F.R. § 404.1520 (e).  Fifth, if a claimant's impairments (considering his or her residual

functional capacity, age, education, and past work) prevent him or her from doing other work that

exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520 (f).

     In determining whether a claimant's physical and mental impairments are sufficiently

severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must

consider any medically severe combination of impairments throughout the disability determination

process.  42 U.S.C. § 423 (d)(2)(B).  The ALJ must evaluate a disability claimant as a whole

person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v.

Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make specific and well-

articulated findings as to the effect of a combination of impairments when determining whether an

individual is disabled.  *See id.*, 985 F.2d at 534.

     The claimant has the burden of proving the existence of a disability as defined by the Social

Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  The claimant must prove

disability on or before the last day of his or  her insured status for the purposes of disability

benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d

1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416 (i)(3); 423(a), (c).  If a claimant becomes disabled

after the claimant has lost insured status, his or her claim for disability benefits must be denied

despite the disability.  *See, e. g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v.

Califano*, 574 F.2d 274 (5th Cir. 1978).

### E.   The Evaluation of Mental Disorders

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in eight diagnostic categories. 20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace;  and ability to tolerate increased mental demands associated with competitive work).  A

"marked" degree of limitation means more than moderate, but less than extreme.  A marked

limitation may arise when several activities or functions are impaired or even when only one is

impaired, so long as the degree of limitation is such as to seriously interfere with the ability to

function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The

Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all

evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The

technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§

404.1520a and 416.920a.

        The presence of a mental disorder should be documented primarily on the basis of reports

from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals

and clinics.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Information from both medical and non-medical

sources may be used to obtain detailed descriptions of the individual's activities of daily living;

social functioning;  concentration, persistence and pace;  or ability to tolerate increased mental

demands (stress).  This information can be provided by programs such as community mental health

centers, day care centers, and family members who have knowledge of the individual's functioning.

20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or

social functioning given by individuals or treating sources may be insufficiently detailed and/or

may be in conflict with the clinical picture otherwise observed or described in the examinations or

reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a

proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not adequately describe these individuals' sustained ability to function.  It is, therefore, vital to review all pertinent information relative to the individual's condition, especially

at times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to

obtain adequate descriptive information from all sources which have treated the individual either

currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and

ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may

control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment

may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt.

404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic

medications, particular attention must be focused on the functional restrictions which may persist.

These functional restrictions are also to be used as the measure of impairment severity.  20 C.F.R.

Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to

temporary remission.  In assessing whether medical improvement has occurred in persons with this

type of impairment, the ALJ will consider the longitudinal history of the impairments, including

the occurrence of prior remission, and prospects for future worsening.  Improvement in such

impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R.

§ 404.1594 (iv).

The Listing for Affective Disorders is as follows:

**12.04** **Affective Disorders**:  Characterized by a disturbance of mood, accompanied
by a full or partial manic or depressive syndrome.  Mood refers to a prolonged
emotion that colors the whole psychic life;  it generally involves either depression or
elation.
The required level of severity for these disorders is met when the requirements in
both A and B are satisfied.

A.      Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities;  or
b. Appetite disturbance with change in weight;  or
c. Sleep disturbance;  or
d. Psychomotor agitation or retardation;  or
e. Decreased energy;  or
f. Feelings of guilt or worthlessness;  or
g. Difficulty concentrating or thinking;  or
h. Thoughts of suicide;  or
i. Hallucinations, delusions or paranoid thinking;  or

2. Manic syndrome characterized by at least three of the following:
a. Hyperactivity;  or
b. Pressure of speech;  or
c. Flight of ideas;  or
d. Inflated self-esteem;  or
e. Decreased need for sleep;  or
f. Easy distractibility;  or
g. Involvement in activities that have a high probability of painful consequences which are not recognized;  or
h. Hallucinations, delusions or paranoid thinking; or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
AND

B.      Resulting in at least two of the following:
1. Marked restriction of activities of daily living;  or
2. Marked difficulties in maintaining social functioning;  or
3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. Pt. 404, Subpt. P, App. 1.

**F.     Other Work**

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills."  *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).  It is only when the

claimant can clearly do unlimited types of work at a given residual functional level that it is

unnecessary to call a vocational expert to establish whether the claimant can perform work which

exists in the national economy.  *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989);

*Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a

specific finding as to whether the non-exertional limitations are severe enough to preclude a wide

range of employment at the given work capacity level indicated by the exertional limitations.

*Foote*, 67 F.3d at 1559.

### 1.    <u>Pain</u>

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress

has determined that a claimant will not be considered disabled unless he furnishes medical and

other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical

impairment which could reasonably be expected to produce the pain or symptoms alleged.  42

U.S.C. § 423 (d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms,

including pain, and determine the extent to which the symptoms can reasonably be accepted as

consistent with the objective medical evidence.   20 C.F.R. § 404.1528.  In determining whether the

medical signs and laboratory findings show medical impairments which reasonably could be

expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain

standard":

> The pain standard requires (1) evidence of an underlying medical condition and
> either (2) objective medical evidence that confirms the severity of the alleged pain
> arising from that condition or (3) that the objectively determined medical condition
> is of such a severity that it can be reasonably expected to give rise to the alleged
> pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423 (d)(5)(A).

## 2.   **Credibility**

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Foote,* 67 F.3d at 1561-62*; Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983)

(although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

V.      **APPLICATION AND ANALYSIS**

   A.      **The Facts**

   Born on October 2, 1962, Waldon was forty-one years old at the time of the ALJ's decision.[3]   R. 51.   Waldon has a ninth-grade education, and his past relevant work experience includes work as a fork lift operator, general laborer, and transportation driver.   R. 68, 314-15. Waldon claims an inability to work beginning December 1, 2001.   R. 319.

   On August 3, 2001, Waldon went to the Veterans Administration ["VA"] for complaints of right leg pain after a fall.   Examination showed good range of motion and intact sensations.   X-rays of the lumbosacral spine showed intact vertebral body heights and disc spaces.   The impression was normal, and the physician prescribed medication.   R. 218-20.   On October 19, 2001, Waldon returned to the VA with complaints of continuing numbness in his right leg.   X-rays of the right tibia and fibula were normal.   R. 213-17.   On November 7, 2001, Waldon requested an evaluation for back pain.   R. 212.

   On December 18, 2001, Jack Pulwers, M.D., performed a consultative examination for disability purposes.   Waldon described having chronic back pain that varied in intensity.   He stated that the pain originated in his mid-thoracolumbar region and radiated into his right leg. Examination showed moderate thoracolumbar paraspinal muscle spasms and tenderness to palpation, but no cervical or sacroiliac tenderness.   Waldon had full range of motion of all joints,

---

[3]He is now forty-two years old.

-19-

except a decreased range of motion of the thoroacolumbar spine and slightly decreased range of

motion of hip flexion.  Specifically, Waldon had 15 degrees of extension, lateral flexion, and

rotation (compared with a normal limit of 30 degrees), 60 degrees of forward flexion (compared

with 90 degrees), and 80 degrees of hip flexion (compared with 90 degrees).  X-rays of the

lumbosacral spine showed slight dextroscoliosis, facet arthritis at L2-L3, L3-L4, L4-L5, and L5-S1,

moderate encroachment at L5-S1, L4-5, and L2-L3, and a vacuum disc phenomenon at all levels.

The final impressions were lumbosacral spondylosis with degenerative disc disease and

degenerative joint disease of the lumbar spine and right sciatica.  R. 116-22.

   The record contains an undated physical functional residual capacity form completed by

state agency physician Alan G. Tetlow, M.D.  Although undated, Dr. Tetlow's notes indicate that

the opinion was likely rendered during a period from December 2001 - October 2002.[4]  Dr. Tetlow

opined that Waldon could occasionally lift/carry fifty pounds, twenty-five pounds frequently,

sit/stand/walk for six hours, and had no pushing/pulling limitations.  Regarding postural

limitations, Waldon could frequently climb, balance, kneel, and crawl, but only occasionally stoop

and crouch.  In all other respects, Waldon had no functional limitations.  R. 123-30.

   On December 28, 2001, an MRI of the back revealed left paracentral disc osteophyte

complex at L5-S1 causing some encroachment on the exiting L5-S1 nerve root on the left.  R. 211.

Waldon returned to the VA on January 3, 2002 for complaints of sleeplessness due to pain.  The

assessment was back pain due to left paracentral disc complex.  Treatment comprised medication.

---

[4]Dr. Tetlow noted that Waldon was 39 years old (R. 124), and cited to Dr. Pulwers' consultative examination of
December 18, 2001.  R. 125.  From Dr. Tetlow's notes and Waldon's date of birth (October 2, 1962), the Court infers
that Dr Tetlow rendered his opinion between December 2001 and October 2002.

R. 209-10.  On January 7, 2002, Waldon underwent an electro diagnostic study.  The impression

was normal with no findings suggestive of lumbar or lumbosacral radiculopathy, peripheral

neuropathy, entrapment mononeuropathy, or myopathy.  The physician opined that Waldon's

symptoms arose from his disc lesion.  He administered an epidural steroid injection at L5-S1.  R.

202-05.  Waldon received an additional injection on January 25, 2002.  R. 199.

On February 8, 2002, Waldon reported complete relief of pain for a week following the

injections, but stated that the pain returned at bedtime.  He also stated that his pain increased with

prolonged  sitting, standing, or walking.  The impression was pain due to osteophyte complex at

L5-S1.  R. 196.  On March 8, 2002, Waldon received an additional injection.  R. 193.

On April 3, 2002, Waldon's physical therapist noted that Waldon tolerated the treatment

well and reported feeling better following treatment.  R. 185.  On April 5, 2002, Waldon reported

only morning stiffness, and said that his severe lower back pain was gone.  He reported a new pain

in the upper lumbar spine toward the right.  The doctor thought this new pain probably was due to

facet arthropathy and prescribed Ibuprofen.   X-rays revealed obliteration of the T12-L1 and L1-2

facet joint space.  The diagnosis was probable facet arthropathy.   R. 183.

On April 24, 2002, state agency physician Nicholas H. Bancks, M.D., completed a physicial

residual functional capacity assessment.  Dr. Bancks opined that Waldon could occasionally

lift/carry twenty pounds, ten pounds frequently, sit/stand/walk for six hours, and had no

pushing/pulling limitations.  Regarding postural limitations, Waldon could frequently climb ramp

and stairs, kneel, and crawl, but occasionally stoop, balance, and crouch, and could never climb a

ladder, rope, or scaffold.  Finally, he opined that Waldon needed to avoid concentrated exposure to

hazards such as machinery and heights.  In all other respects, Waldon had no functional limitations.
Dr. Banks concluded that Waldon's symptoms were attributable to a medically determinable
impairment, but that the severity of his symptoms were disproportionate to the expected severity
based on Waldon's medically determinable impairments.  R. 131-38.

On April 27, 2002, Waldon reported worsening back pain unrelieved by remedies and pain
medication.  R. 179.  On May 15, 2002, Waldon reported no benefit from the injections except for
temporary pain reduction.  R. 173.  On May 17, 2002, Waldon received an injection for the right
upper lumbar facet joint.  R. 170.  On June 7, 2002, Waldon reported improvement and stated that
he had pain only in the tail bone and only in the morning.  He was able to walk comfortably for
twenty-five minutes before experiencing pain.  The impressions were L2-3 and L3-4 facet
arthropathy relieved with facet joint injection, and left paracentral disc osteophyte complex at L5-
S1.  R.  168.

On July 22, 2002, Waldon reported back pain for a week following heavy yard work.  R.
167.  On July 29, 2002, Waldon complained of a sharp pain just above his groin after doing a lot of
heavy lifting.  R. 164.  On August 30, 2002, Waldon reported that his low back pain was interfering
with his ability to walk, sit, and sleep.  He had local tenderness in the right lower facet joint.  The
impression was lower back pain due to facet arthropathy and disc osteophyte complex.  The
physician noted that Waldon was unable to work.  R. 152.

On October 11, 2002, Waldon received injections for back pain.  R. 286.  On October 22,
2002, Waldon returned with significant pain in the middle of his upper lumbar spine.  R. 145.
Examination revealed limited range of motion and muscle guarding.  An MRI showed herniated

nucleus pulposus at L4-5.  The impression was muscle spasm.  Treatment comprised medication and home exercise.  The physician noted that Waldon would be unable to return to construction work through the following year.  A surgical consultation determined that Waldon was not a candidate for back surgery, and his leg pain was not severe enough to warrant surgery.  R. 145-47.

On October 24, 2002, Waldon described continuing back pain and numbness with no improvement.  R. 140.  On January 2, 2003, Waldon had an evaluation for depression.  The diagnosis was depression and dysthymia, and Waldon's global assessment of functioning was 45.[5] He was prescribed medication and group therapy.  R. 290-91.

On December 2, 2002, Dr. Lalitha Ganesh (degree and board certifications unknown) performed a functional capacity evaluation.  Examination showed Waldon had full range of motion and normal strength in his arms and legs, and a "generally normal" range of motion in his back. Anterior flexion at the lumbosacral spine caused pain.  Dr. Ganesh noted no symptom exaggeration.  His standing balance was normal, and he could walk on his toes and heels with some difficulty.  X-rays of his hips and spine were normal.  The impression was chronic lumbar pain. Dr. Ganesh noted that Waldon would be undergoing a full functional capacity evaluation and that the necessary forms would be completed.[6]  R. 292-93.

---

[5]The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"] at 32.  Axis V of the DSM-IV's multiaxial evaluation assesses a patient's current GAF on evaluation, as well as the patient's highest GAF level in the past year.  DSM-IV at 30 - 33.  A GAF code of 41 - 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), OR serious impairment in social or occupational functioning (e.g., no friends, unable to keep a job).  DSM-IV at 32.

[6]No RFC forms appear in the record, and the record does not reflect that such RFC evaluation was ever performed.

On March 4, 2003, the VA noted that Waldon was unable to return to his prior work.  Notes indicate that Waldon was receiving vocational rehabilitation and training for a desk job.   R. 282.  On July 8, 2003, Waldon went to Marcil E. Salem, M.D., for complaints of chronic back pain.  Waldon reported that the facet joint injections had relieved his pain at L2-3 and L3-4.  Treatment comprised medication.  R. 277.

> **B.**        **The Analysis**

Waldon argues that the ALJ erred by not utilizing the testimony of a VE because Waldon experienced totally disabling pain.[7]  Waldon further argues that the ALJ failed to evaluate properly his non-exertional impairments and erroneously discredited Waldon's allegations.  Waldon is wrong.  Substantial evidence supports the ALJ's finding that Waldon's pain did not preclude him from performing an unlimited range of sedentary work.

The medical and other evidence show that Waldon suffered from severe impairments causing back pain, but the evidence shows no medical impairment that could reasonably be expected to produce the pain or symptoms alleged.  In December 2001, an MRI showed paracentral disc osteophyte complex.  Throughout the relevant period covered by the record (August 2001 - July 2003), Waldon was treated conservatively with medication, therapy, and injections.   From January 2002 through October 2002, Waldon received injections on about five occasions.  Although he complained sporadically of pain during this period, the evidence establishes a trend of improvement.  Waldon received two injections in January 2002.  In February 2002, he reported

---

[7]Although Waldon recites in his Statement of Facts that he was once diagnosed with depression and assessed a GAF of 45, R. 290, his argument on appeal and claims of error are based solely on his back pain.

some pain relief except during prolonged sitting, standing, or walking.  Waldon received another

injection in March 2002.

By April 2002, he reported elimination of lower back pain, but had a new pain in his upper

back.  However, Dr. Banks, a non-examining physician determined that Waldon's symptoms were

disproportionate to his impairments and concluded that Waldon could perform light work.   Dr.

Tetlow, another non-examining physician, concluded (on an unknown date likely between

December 2001 and October 2002) that Waldon could perform medium work.  In May 2002,

Waldon received another injection.  By June, he reported improvement and could walk for more

than twenty-five minutes without experiencing pain.  In July, Waldon was performing heavy yard

work and heavy lifting.

Waldon received another injection in October 2002, and complained of continuing pain in

his upper back.  An MRI indicated a herniated nucleus pulposus in his lumber spine.  However,

surgery was specifically ruled out.  By December 2002, an examining physician noted some pain in

Waldon's lumbosacral spine, but found that he had "generally range of motion" of his back.  From

December 2002 to July 2003, the record shows minimal complaints of, or treatment for, back pain.

In July 2003, Waldon reported that the injections had relieved his pain at the L2-3 and L3-4 joints,

but he continued to experience other back pain.

At the hearing, Waldon testified that he experienced constant back pain.  Due to his pain,

Waldon stated that he walked with a cane, experienced sleeplessness, and could not sit for more

than twenty minutes, walk more than one block, or traverse stairs.  With respect to his activities of

daily living, Waldon testified that he dressed himself and drove a car occasionally, but was unable

to cook, wash dishes, do laundry, make his bed, perform yard work, or engage in social or recreational activities.  R. 309-14.  The ALJ properly discredited Waldon's allegations of totally disabling pain, as the evidence does not support such extreme limitations.

## VI.    <u>CONCLUSION</u>

The ALJ properly evaluated and discredited Waldon's allegations of disabling pain. Although VE testimony is preferred, exclusive reliance on the Grids was sufficient in this case because Waldon could perform a full range of sedentary work.  Although Waldon had non-exertional impairments (back pain), his back pain did not significantly limit his ability to do sedentary work.

For the reasons stated above, it is **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.  Failure to file written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 6.02 within ten days of the date of its filing shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal.  Any party appealing this decision shall file and serve a copy of the oral argument transcript within thirty days of this order.

**DONE AND ORDERED** this 23rd day of June, 2005.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

The Honorable John Antoon II

Mary Ann Sloan, Chief Counsel
Dennis R.  Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL             33602

The Honorable Chester G. Senf
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL             32817